**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| QUAD/TECH, INCORPORATED, | ) | |
| | ) | Civil Action No. 2:09-cv-02561-ECR |
| Plaintiff, | ) | |
| | ) | Hon. EDUARDO C. ROBRENO |
| v. | ) | |
| | ) | |
| Q.I. PRESS CONTROLS B.V., | ) | |
| Q.I. PRESS CONTROLS NORTH | ) | JURY TRIAL DEMANDED |
| AMERICA LTD., INC. | ) | |
| | ) | |
| and | ) | |

PRINT2FINISH, LLC,
                              Defendants.

**MEMORANDUM OF DEFENDANTS Q.I. PRESS CONTROLS B.V.**
**AND Q.I. PRESS CONTROLS NORTH AMERICA LTD., INC.**
**IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Defendants Q.I. Press Controls B.V. and Q.I. Press Controls North America Ltd.

(collectively, the "QIPC Defendants") respectfully submit this Memorandum of Law in

Opposition to the Motion of Quad/Tech, Incorporated (hereinafter "Quad/Tech") for Preliminary

Injunction.

## I.    SUMMARY OF ARGUMENT

Quad/Tech has requested a preliminary injunction against a product, the mRC+™

Registration System (hereinafter the mRC System) sold and offered for sale by the QIPC

Defendant, because allegedly the mRC System infringes Claim 29 of a patent (the '577 patent')

owned by Quad/Tech.  Quad/Tech, however, is not entitled to a preliminary injunction, because

Quad/Tech is unable to meet any of the four elements required in a patent-infringement matter:

(1) likelihood of success on the merits; (2) irreparable harm should the injunction not issue; (3) balance of the hardships in movant's favor; and (4) effect on the public interest.

**(1)      Likelihood of Success on the Merits**

First, Quad/Tech will lose on the merits, because the mRC System is not covered by any claims of the '577 patent.  The mRC System lacks all claim limitations, set forth in bold and italics below, of Claim 29, which is the only claim presented in Quad/Tech's Motion for Preliminary Injunction.  Claim 29 states:

> 29. A system for generating a signal representative of color registration offset between at least first and second colors of an image printed on a web, where a first printing unit prints the first color of the image and a second printing unit prints the second color of the image, the system comprising:
>
> a memory *disposed to store a first reference array of digital data representative of the first color of at least a portion of the image and a second reference array of digital data representative of the second color of the portion*;
>
> an imaging device in optical communication with the web *to produce a first analog signal representative of the first color of the portion of the image and a second analog signal representative of the second color of the portion*;
>
> *a converter circuit, operatively associated with the imaging device and memory, which converts the first analog signal to a first color array of digital data, and converts the second analog signal to a second color array of digital data, where the first and second color arrays are stored in the memory*; and
> a processing circuit *in communication with the converter circuit* and the memory, *where the processing circuit compares the first reference array with the first color array and compares the second reference array with the second color array to determine a registration offset between the first and second colors and produces a signal representative the registration offset between the colors*.

A fundamental and material difference between the mRC System and the '577 Patent is that all limitations of Claim 29 require a system configured to perform color registration based only upon the image (i.e., the actual printed work such as a scene or picture) printed on a paper by a print system.  By contrast, the mRC System measures whether colors are properly aligned by a print system on a paper by measuring small registration marks printed in a predetermined pattern distinct from (i.e., next to or preceding) the actual printed image or work, but nowhere on the printed image itself.  In fact, the mRC System is not capable of performing color registration without registration marks that are distinct from any portion of the actual printed image.

Second, Quad/Tech's Motion should be denied, because it is likely that the Court will declare that the '577 patent is unenforceable, because Quad/Tech obtained the '577 patent through inequitable conduct before the United States Patent and Trademark Office ("USPTO").

Third, The German Court's decision, which Quad/Tech relies on in this lawsuit, did not involve the '577 patent or the mRC System sold in the United States.  It was a decision by a German Court that applied German law, to a dispute involving a German patent.  The decision is neither binding nor relevant to any issue before this Court.  The mRC System at issue in this case is not enjoined in Germany and is still sold there.  *See* E. van Holten Declaration, attached as Exhibit A at ¶ 28.

**(2)    There is No Irreparable Harm.**

Quad/Tech cannot argue in good faith that it will suffer irreparable harm.  Quad/Tech presently has not implemented the '577 patent in any product it currently sells.  Thus, Quad/Tech cannot prove a direct nexus between any alleged loss of sales and the mRC System with respect to the '577 patent.

(3)      **The Balance of the Hardships in Movant's Favor**.

The balance of harm greatly favors denying Quad/Tech's Motion.  The mRC System at issue in this case represents the next generation of expected growth for the QIPC Defendants in the United States.  *See* E. van Holten Declaration, attached as Exhibit A at ¶ 29.  It is one of three products offered for sale by the QIPC Defendants in the United States.  *Id.*  A preliminary injunction against sales of the mRC System in the United States would jeopardize operations of the QIPC Defendants in this country and likely force QIPC to close operations in the U.S., including the laying off of its employees.  *Id.*  As a result, the QIPC Defendants will no longer be able to support and service customers that use and rely on the QIPC Defendants' products should its operations close due to an injunction.  For example, the QPIC Defendants would no longer support and service customers that use and rely on the QIPC Defendants' products in the U.S., including multiple large newspapers.  *Id.* at ¶ 30.

(4)      **The Public Interest**

A preliminary injunction is not in the public interest, because in light of the Claim Construction provided in this Memorandum at pages 11 through 24, it is not in the public interest to enjoin sales of a product (the mRC System) that does not infringe Claim 29 of the '577.  The mRC System is distinctly different from the '577 patent, a patent that has never been translated into an operational product and was procured by Quad/Tech through inequitable conduct.


II.      **RELEVANT FACTS**

A.      **The mRC™ Register System's Technology**.

1.      The mRC System sold and offered for sale in the United States by Defendant Q.I. Press Controls North America Ltd., Inc. is a calibration system for checking whether separate colors (typically cyan (C), magenta (M), yellow(Y) and black (B) collectively

CMYK)), are properly aligned with respect to each other when printed on a paper (or other suitable medium) by a printing system.   *See* Declaration of E. van Holten, attached as Exhibit A at ¶ 1.

2.      If these colors are not properly aligned with respect to each other, a printed work will appear out of focus.  Exhibit A at ¶ 2.

3.      The mRC System measures whether colors are properly aligned by the printing system by measuring small registration marks printed in a predefined pattern next to or preceding the actual printed work, but completely distinct from the printed work itself.  Exhibit A at ¶ 3.

4.      Specifically, a camera images the registration and reference marks to ascertain whether the registration and reference marks (shown below in Figure A), each representing a different color, are the correct distance from two reference marks (shown as solid black in Figure A).  All of the marks are distinct (and not printed within) the actual printed work or image.  Exhibit A at ¶ 4.

5.      The schematic below shows the registration marks for each color and the two reference marks for distance measurement.  In case of a printed product that is trimmed afterwards these marks are normally printed on a portion of the paper, which is eventually cut and discarded.   Exhibit A at ¶ 5.



Figure A

6.      If each registration mark (color) is the correct distance from the two reference marks (in this case black) measured by the mRC System, then the printing system, in communication with the mRC System, will print a printed image with clarity.   Exhibit A at ¶ 6.

7.      If, on the other hand, each registration mark is not the correct distance from a reference mark, as measured by the mRC System, then the printed image may appear out-of-focus, unless corrective steps are taken with the printing system.  Exhibit A at ¶ 7.

8.      The mRC System offered for sale or sold in the U.S. has no ability to perform color registration by optically scanning the actual printed image or work.  Exhibit A at ¶ 8.

9.      The mRC System is only able to perform color registration by optically scanning and measuring the preset pattern of registration and reference marks, which are distinct from an actual printed image or work.  Exhibit A at ¶ 9.

10.     Further, the mRC System cannot perform color registration without scanning pre-defined registration and reference marks.  It cannot operate at all without scanning those marks.  Exhibit A at ¶ 10.

11.     Figure B below shows an actual printed image on a page.  The registration marks are printed on the side of the sample printed work, but cannot be seen in this figure. Exhibit A at ¶ 11.



Special marks to be used for colour control measurements

Fig. B

Special marks and lines to be used for cutting and folding alignments

12.    Figure C below shows a magnified view of a part of the page from Figure B, in which the registration marks are visible.  *See* Exhibit A at ¶ 12.



Fig. C

Special marks to be used for the
mRC+ register system

13.     The registration and reference marks made on the edge of the page are eventually discarded, as that part of the paper is normally cut from the printed image.  *See* Exhibit A at ¶ 13.

14.     The mRC System is patented in the United States under U.S. Patent No.

6,108,436, which is owned by Defendant Q.I. Press Controls, B.V.  *See* Exhibit A at ¶ 14.

15.     The use of registration marks distinct from the actual printed image is a

well-known prior art technique dating back decades.  *See* Exhibit A at ¶ 15.  The following prior-

art U.S. Patents were filed and issued long before the filing date of the '577 patent:

| Patent List | | | |
|---|---|---|---|
| Patent No. | Title | Date of Issue | Inventor |
| 2,576,529 | Web Registration Device | 27-Nov-51 | McKenney et al. |
| 3,915,090 | Printed pattern and embossed pattern registration control system | 28-Oct-75 | Horst et al. |
| 4,278,893 | Alignment apparatus | 14-Jul-81 | Kato et al. |
| 4,528,630 | Automatic registration control method and apparatus | 9-Jul-85 | Sargent |
| 4,532,596 | Controlling register in a printing press | 30-Jul-85 | Pugsley |
| 4,552,608 | System for computer controlled labeling machine | 12-Nov-85 | Hoffman et al. |
| 4,578,590 | Continuous alignment target pattern and signal processing | 25-Mar-86 | Wu |
| 4,719,575 | Method and apparatus for controlling web handling machinery | 12-Jan-88 | Gnuechtel |
| 4,318,176 | Computerized press controls | 2-Mar-82 | Stratton et al. |
| 4,366,542 | Controlling the operation of a printing equipment | 28-Dec-82 | Anselrode |
| 4,561,103 | Print inspecting method and apparatus | 24-Dec-85 | Horiguchi et al. |
| 4,794,453 | Method and apparatus for stroboscopic video inspection of an asynchronous event | 27-Dec-88 | Gnuechtel et al. |
| 4,887,530 | Web registration control system | 19-Dec-89 | Sainio |

16.     Specifically, U.S. Patent 4,887,530, issued to Sainio, the same inventor of

the '577 patent, discloses a registration system in which registration marks are used to perform

color registration.  *See* '577 patent [1:20–45], attached hereto as Exhibit B.

- 10 -

17.     The "Background of the Invention" section of the '577 patent emphasizes that one of the problems the '577 patent sought to solve was "to provide a system which is able to provide color-to-color registration based only upon scanning the image being printed" and not any "registration mark distinct from the image being printed." <u>See</u> '577 patent [1:36–45] [1], attached as Exhibit B.

18.     Quad/Tech, the applicants, or the inventors of the '577 patent had a duty of candor and good faith, including a duty of disclosure, in their dealings with the USPTO.  They were required to disclose material prior art and material information in connection with the prosecution of U.S. Patent Application Serial No. 07/967,978 (the '978 application), which issued as the '577 patent.

19.     After the '978 application was filed in the USPTO, the assignee of the '978 application, Quad/Tech, filed a European Patent Application on or about 18 October 1993 (the "EPO Application").

20.     On or about 1 March 1994, the EPO published a Search Report in association with the EPO application, identifying six prior-art references.  The report identified the references as being of "technological background" or "theory or principle underlying the invention" — which means that the EPO found that the references were relevant to the EPO application.  *See* EPO Search Report, attached as Exhibit C.

21.     On or around March 1, 1994 date, the EPO sent Quad/Tech's attorneys a copy of the European Patent Office Search Report.  At that time, the '978 application was still

---

[1] The bracketed numbers refer, in order, to the column number in the '577 patent and the lines within the designated columns.

pending, and had not yet been issued as the '577 patent.  *See* EPO Search Report, attached as

Exhibit C.

      22.     On 2 May 1995, the '978 application was issued as the '577 patent.  The

applicants never provided the EPO Search Report or the six references identified therein to the

USPTO.

      23.     The six references are listed below:

> Exhibit D.    Publication No.:  EP0324718 (published 1989),
> which has a U.S. counterpart patent, namely, U.S. Patent No.
> 4,975,862 entitled *"Process and Apparatus for the Ink Control of
> Printing Machine"*, issued 1990.

> Exhibit E.    Publication No.:  EP0451106 (published 1991),
> which has a U.S. counterpart patent, namely, U.S. Patent No.
> 5,206,707, entitled *"Apparatus for the Analysis of Print Control
> Fields"* issued 1993.

> Exhibit F.    Publication No. EP0143744 (published 1985),
> which has a U.S. counterpart patent, namely, U.S. Patent No.
> 4,649,502, entitled *"Process and Apparatus for Evaluating
> Printing Quality and for Regulating the Ink Feed Controls in an
> Offset Printing Machine"* issued in 1987.

> Exhibit G.    Publication No. EP0408507 (published 1991),
> which has a U.S. counterpart patent, namely, U.S. Patent No.
> 5,068,810, entitled *"Determination of Colormetric Differences
> Between Two Screen Pattern Fields Printed by a Printing Machine
> and Process for the Color Control or Ink Regulation of the Print of
> a Printing Machine"* issued 1991.

> Exhibit H.    U.S. Patent No. 5,224,421 entitled *"Method for
> Color Adjustment and Control in a Printing Press"* issued 1993
> filed April 28, 1992.

> Exhibit I.    Publication No. EP0527285 (published 1993),
> which has a U.S. counterpart patent, namely, U.S. Patent No.
> 5,317,390, entitled *"Method for Judging Printing Sheets"* filed
> August 1992 and issued May 31, 1994 (hereinafter the "Bolza-
> Schunemann reference").

*See* Exhibits D through I.

24.     The persons prosecuting the '577 patent knew of the foregoing material prior art references and the EPO Search Report, but failed to disclose them to the USPTO.

25.     One or more of the six undisclosed prior art references above anticipate and/or render obvious Claim 29 of the '577 patent.

### B.     Quad/Tech's Allegations

26.     In its Complaint and in its Motion for Preliminary Injunction, Quad/Tech has presented no evidence of infringement, because Quad/Tech has not provided any analysis that compares Claim 29 of the '577 Patent to the mRC System.

27.     By way of example, Quad/Tech has not provided a chart that compares the claim limitations of Claim 29 to the commercially available mRC System, sold and offered for sale in the United States.

28.     The only allegation Quad/Tech provides is a broad statement that the '577 patent covers all color registration systems in the United States that operate in either marked or mark-less mode.  *See* Complaint at ¶ 25.

## III.   ARGUMENT

### A.     Standard of Review

A preliminary injunction is an extraordinary remedy.  *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1375 (Fed. Cir. 2009).  The factors the trial court considers when determining whether to grant a preliminary injunction are of longstanding and universal applicability.  As the Supreme Court recently reiterated, there are four: "[a] plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural*

*Res. Def. Council, Inc.,* --- U.S. ----, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008) (collecting

Supreme Court cases). *See also eBay, Inc., v. Merc. Exchange*, *LLC,* 547 U.S. 388, 391 (2006).

To prove infringement, Quad/Tech must show that the mRC System falls within the

boundaries of the '577 Patent as defined by that patent's claims. *See* Step two requires a

determination that every claim limitation or its equivalent be found in the accused device.

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 29, (1997). The determination

of whether infringement has occurred consists of two steps: 1) claim construction (construing the

claims at issue to determine the scope of the claims), and 2) comparing the properly construed

claims to the allegedly infringing device. *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454

(Fed. Cir. 1998) (en banc) (citations omitted). Step two requires a determination that every claim

limitation or its equivalent be found in the accused device. *Warner-Jenkinson Co.,* 520 U.S. at

29.

**B.      Construction of Claim 29 of The '577 Patent.**

Long ago, the Supreme Court articulated the principle that guides all courts in construing

disputed claim terms:

> [I]n case of doubt or ambiguity it is proper in all cases to refer back
> to the descriptive portions of the specification to aid in solving the
> doubt or in ascertaining the true intent and meaning of the
> language employed in the claims.

*Bates v. Coe*, 98 U.S. 31, 38 (1878). That principle remains the law today. The Federal Circuit

has repeatedly emphasized that "the specification is always highly relevant to the claim

construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a

disputed term." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (quoting

*Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The specification

provides the context essential to the task of claim construction. *Id.* "[T]he person of ordinary

skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 425 F.3d at 1313.

The construction of Claim 29 below follows this approach and looks to the specification to construe the language of Claim 29.  Brackets are inserted to denote elements in the claims for which a proposed claim construction is provided.  Claim 29 states:

A system for generating a signal representative of color registration offset between at least first and second colors of an image printed on a web, where a first printing unit prints the first color of the image and a second printing unit prints the second color of the image, the system comprising:

**[Element A]** a memory **[Element A1]** disposed to store a first reference array of digital data representative of the first color of at least a portion of the image and **[Element A2]** a second reference array of digital data representative of the second color of the portion;

**[Element B]** an imaging device in optical communication with the web to produce **[Element B1]**a first analog signal representative of the first color of the portion of the image and a second analog signal representative of the second color of the portion;

**[Element C]** a converter circuit, operatively associated with the imaging device and memory, **[Element C1]** which converts the first analog signal to a first color array of digital data, and converts the second analog signal to a second color array of digital data, where the first and second color arrays are stored in the memory; and

**[Element D]** a processing circuit in communication with the converter circuit and the memory, **[Element D1]** where the processing circuit compares the first reference array with the first color array and compares the second reference array with the second color array to determine a registration offset between the first and second colors and produces a signal representative the registration offset between the colors.

Claim 29 is a system claim that comprises the following claim elements: Element A (a "memory"), Element B ("an imaging device") Element C ("a converter circuit") and Element D ("a processing circuit").  Elements A1, A2, B1, C1, and D1 describe respectively the functionality of Elements A, B, C and D.[2]

Based on the specification of the '577 patent, the QIPC Defendants offer the following construction of elements A, B, C, and D, and A1, A2, B1, C1, and D1.

### 1.   Elements A, A1 and A2

Element A, *("a memory")*, should be construed as "storage for data of a conventional computer." *See* '577 patent, [8:20-25] and reference no. 33 in Figure 1, attached hereto as Exhibit B.  Element A1 (*"disposed to store a first reference array of digital data representative of the first color of at least a portion of the image"*) should be construed to mean the following:

> Arranged to store first pre-press image data in the form of an image-density array of the first color representative of at least a portion of the actual printed work.  The claim limitation "at least a portion of the image" must exclude registration and reference marks distinct from any portion of the image (i.e. the actual printed work).

See also Claim Construction Chart of the QIPC Defendants, attached hereto as Exhibit J, at 1, in which the QIPC Defendants set forth the proper claim construction of Claim 29 of the '577 patent.

The claim limitation **"disposed to store"** must be construed as "arranged to store."  The term "disposed to" is not defined in the specification of the '577 patent, but the plain, ordinary general dictionary meaning of "disposed" is "to place or set in a particular order; arrange."  *See,*

---

[2] For ease of reference, Elements A1 and A2 refer to the functionality of Element A; Element B1 refers to the functionality of Element B; Element C1 refers to the functionality of Element C; and Element D1 refers to the functionality of Element D.

*e.g.*, The American Heritage Dictionary, Second College Edition, page 407 (1985), an excerpt of which is attached as Exhibit K.

The claim limitation "***a first reference array of digital data representative of the first color of at least a portion of the image***" is not mentioned verbatim in the specification as drafted in Claim 29.  However, the '577 patent's specification details what is meant by "*a first reference array of digital data representative of the first color of at least a portion of the image*."  As used in the specification, the term "first color" refers to either C, M, Y or K.  *See* '577 patent [11:17-20], attached as Exhibit B.

Thus, the claim limitation "***at least a portion of the imag****e*" must be construed to include the actual work being printed and cannot include registration and reference marks separate from the actual printed work.

The "Background of the Invention" section of the '577 patent emphasizes that one of the issues addressed by the '577 patent was "to provide a system which is able to provide color-to-color registration based only upon scanning the image being printed" and not any "registration mark distinct from the image being printed."  *See* '577 patent [1:36-45], attached as Exhibit B. (Emphasis is added).  Thus, one of the issues addressed by the '577 patent was a desire to invent a color-to-color registration system that did not rely on registration and reference marks distinct from the actual image being printed, as performed in the prior art, because in part that prior art "requires additional paper which is discarded and adds cost to the printing process."  *Id.*

Thus, the claim limitation "*at least a portion of the image*" can only refer to the actual printed image or work (i.e. scene) being printed.  It cannot include registration and reference marks printed outside of the boundaries of the actual printed work.  For example, in Figure 2E,

the '577 patent shows a "suitable" image scan area 68 of a portion of the printed work, such as a

hand or flower (see below).  *See* '577 patent, attached as Exhibit B, at Fig 2E.



**FIG. 2E**

The '577 specification's exclusive focus on an image-scan area of the ***actual image*** being

printed, combined with statements made in the Background of the Invention section, defines the

scope of the invention of the '577 patent.  This shows that the '577 patent, Claim 29, is an

invention that performs color registration through an optical scan of at least a portion of the

actual printed work itself, but not registration marks distinct from the actual image.  As stated by

the Federal Circuit, "[t]he construction that stays true to the claim language and most naturally

aligns with the patent's description of the invention will be, in the end, the correct construction."

*See Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societe Per Azioni*, 158 F. 3d

1243, 1250 (Fed. Cir. 1998)).  In fact, in *On Demand Mach. Corp. v. Ingram Indus.*, the Federal

Circuit has made it clear that terms used in the claims cannot be broader or inconsistent with

terms in the specification, construing the term "customer" to mean a "retail customer" and

excluding wholesale customers, because "claims cannot be of broader scope than the invention

that is set forth in the specification."  442 F.3d 1331, 1340 (Fed. Cir. 2006).  "[E]ach term must

be construed to implement the invention described in the specification.  Care must be taken lest

word-by-word definition, removed from the context of the invention, leads to an overall result that departs significantly from the patented invention." *Id.* at 1344 (internal citations omitted).

Quad/Tech would have the Court construe the term "array" as meaning "a large group, number or quantity of people or things in general, or as a block of related data elements in connection with computers." See Sainio Declaration at ¶ 45, attached as Exhibit E to Quad/Tech's Motion for Preliminary Injunction.  Nevertheless, Quad/Tech's proposed general dictionary meaning of "array" from an unnamed-general dictionary is improper, because it relies on an extrinsic source — an unnamed dictionary — when the '577 specification is dispositive on defining this technical term.

Furthermore, the Sainio Declaration's reliance on an unnamed-dictionary definition is improper, because it disavows the intrinsic evidence of the '577 patent.  Given the public notice function of patent claims, Sainio's subjective declaration of a particular construction, is consistently rejected by the Courts.  For example, in *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 985 (Fed. Cir. 1995) (en banc), the Federal Circuit stated that "the subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim (except as documented in the prosecution history)."

The term array in the context of the '577 patent refers to "image density data" which is in the form of a (N x M) density-array matrix for a "reference area."  The process of arriving at the density array involves using Fourier Transforms (FFTs) and various other transforms.  *See* '577 patent, Figures 6A and 6B, as well as Cols. 8–12, attached as Exhibit B.

Based on the foregoing, Element A1 ("***disposed to store a first reference array of digital data representative of the first color of at least a portion of the image***") must mean:

> arranged to store first pre-press image data in the form of an
> image-density array of the first color representative of at least a

portion of the actual printed work.  The claim limitation "at least a portion of the image" must exclude registration and reference marks distinct from any portion of the image (i.e. the actual printed work).

<u>See</u> <u>also</u> Claim Construction Chart of the QIPC Defendants, attached as Exhibit J, at 1.

Thus, the claim limitation for Element A2 ("***a second reference array of digital data representative of the second color of the portion***") must be construed the same as Element A1, except that the reference to the term "second" implies a different array and different color than in Element A1.

### 2.      Elements B and B1

Element B, ("***an imaging device***") is "at least one camera."  *See* '577 patent, Abstract, attached as Exhibit B.  Support is found in Figures 1 and 5 of the '577 patent, reference numbers 36, 104, 106, 108 and 110.  <u>See</u> Exhibit B.

Element B1 ("***a first analog signal representative of the first color of the portion of the image and a second analog signal representative of the second color of the portion***") must be construed to mean first and second analog signals representative of the portion (for example, a scan area) of the actual printed image work scanned by the camera.  Again, ***"portion of the image"*** cannot be construed to include registration or reference marks distinct from the actual printed image or work for the reasons described above with respect to Elements A1 and A2.  The '577 patent "cameras of assembly 36 scan the printed image," such as scan area 68 shown in Fig. 3 below is simply a portion of the images shown in Figs. 2E.



**FIG. 3**

### 3.    Elements C and C1

Element C ("***a converter circuit***") must be construed as "a plurality or image capture

boards of image capture circuitry".  *See* Claim Construction Chart, attached as Exhibit J, at 2.

The '577 patent does not define what a "converter circuit" means, but it does state that image

capture circuitry 48 interfaces with camera assembly 36 and plate scanner 38.  The '577 patent

states that "circuitry 48 (Fig. 1) includes four image capture boards which are connected to the

expansion bus of computer 32."  *See* '577 patent [5: 24–29], attached as Exhibit B.  That is, it is

the image capture circuitry 48 (s*ee* Fig. 4 of '577 patent) and the image capture boards (shown in

Figure 4 as reference numbers 94, 96, 98 or 100) that "convert the analog image signals [from

the camera assembly 36 (Fig. 1)] to digital image data representative of the portion of the printed

image in the reference area 88 or 90 (Fig. 3)."  *See* '577 patent [9: 9–14], attached as Exhibit B.

Because the "converter circuit" also converts the analog image signal received from the imaging

device (the camera), "a converter circuit" must be the "image capture boards of image capture circuitry" is what is taught by the specification of the '577 patent.

Element C1 ("*which converts the first analog signal to a first color array of digital data, and converts the second analog signal to a second color array of digital data, where the first and second color arrays are stored in the memory"*) must be construed as "which converts the first and second analog signals to a first and second color image-density arrays (on-press data) stored in memory." *See* '577 patent [8:14–33, and 10:6–45], attached as Exhibit B; s*ee also* Claim Construction Chart, attached as Exhibit J, at 2. Support for this claim construction is found in columns 7–9 of the '577 patent which state that analog signals of the actual printed work must be converted to a format more readily useable by the processor, which is in the form of an image-density array. *See* '577 patent [9:23–25], attached as Exhibit B.

**4.   Elements D and D1**

Element D ("*a processing circuit*") must be construed as "a processor of a computer." *See* the Abstract and [5:20–21] of the '577 patent, attached as Exhibit B.

Element D1 ("*compares the first reference array with the first color array and compares the second reference array with the second color array to determine a registration offset between the first and second colors and produces a signal representative the registration offset between the colors*") must be construed as:

> compares the first pre-press image data in the form of an image-density array representative of the first color with the first color image-density array, and compares the second pre-press image data in the form of an image-density array representative of the second color with the second color image-density array to determine a registration offset between the first and second colors and produces a signal representative the registration offset between the colors.

*See* Claim Construction Chart, attached as Exhibit J, at 2-3.

Additionally, the specification of the '577 patent requires that the claim limitation term "offset" in Element D1 only be calculated and produced when the data arrays are in the form of "image-density data," which further supports the proposed claim constructions for claim limitations A1, A2, B1, and C1 above. For instance, the '577 patent states that: "[c]omputer 32 would compare the *image density data* from reference areas 87 and 89, and image scan areas 88 and 90 for each of CMYK to determine offsets between CMYK for these areas." *See* '577 patent [11:20–25], attached as Exhibit B. (Emphasis added).

### C. Quad/Tech's Proposed Construction of Claim 29 Is Conclusory, Incomplete and Unreliable.

Any determination of alleged infringement and success on the merits in the instant case must be preceded by a full claim construction of the elements of Claim 29 as proposed above. Quad/Tech's Motion offered a proposed claim construction for the term, "array"[3], and even that proposed construction is contradicted by the specification of the '577 patent. Quad/Tech adds to its proposed construction the sworn statement of Jeffrey Sainio, who bases his testimony on product brochures, advertising, and the web page of the QIPC Defendants. *See* Sainio Declaration, attached as Exhibit E to Quad/Tech's Motion for Preliminary Injunction, at ¶¶ 28-30. Quad/Tech's also relies on Mr. Sainio's review of written submissions and testimony in the case in Germany, which did not involve the mRC System sold by the QIPC Defendants in the United States and at issue here. Quad/Tech offers no evidence that it compared Claim 29 to the elements and functionality of the mRC System at issue in this case, and it appears from his Declaration that Mr. Sainio did not so.

---

[3] Quad/Tech relies on a dictionary to construe a single term "array" in isolation from the specification, but fails to refer to the source dictionary on which it relied.

**D.     The mRC System Does Not Infringe the '577 Patent.**

To prove infringement, the patentee must prove by a preponderance of evidence that the accused device contains each limitation of the asserted claim.  *Biovail Corp., Int'l v. Andrx Pharms, Inc.,* 239 F.3d 1297, 1302 (Fed. Cir. 2001) (citing *Enerion v. Int'l Trade Comm'n*, 151 F.3d 1376, 1384 (Fed. Cir. 1998)).

A proper analysis of literal infringement begins with claim construction. *Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1314, 1320 (Fed. Cir. 2003).  The claims must be construed properly to resolve their true scope and meaning.  *Id.*  Thereafter, a determination must be made as to whether the accused method or device falls within the scope of the properly construed claims.  *Id.*  A finding of literal infringement requires "that the accused device contains every limitation in the asserted claims. If even one limitation is missing or not met as claimed, there is no literal infringement.  *Elkay Mfg. Co. v. Ebco Mfg. Co.,* 192 F.3d 973, 980 (Fed. Cir. 1999) (quoting *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998)).

**1.     The mRC System Lacks Each and Every Element of Claim 29 and Does Not Literally Infringe Claim 29.**

In its Motion, Quad/Tech argues infringement of Claim 29.  For that, Claim 29 is the only claim that the Court should address with respect to the Quad/Tech Motion.  To succeed on the merits, Quad/Tech must prove that each and every element of Claim 29 is present in the mRC System sold or offered for sale in the U.S.

Quad/Tech, however, failed to provide any evidence of patent infringement in its Motion. There is no claim construction provided by Quad/Tech, other than for the word "array", and no infringement analysis.[4]  Quad/Tech never even attempts to compare the claim limitation of Claim

---

[4] Attached as Exhibit L is the Non-Infringement Chart of the QIPC Defendants.  It shows that the mRC System does not infringe the claim limitations of Claim 29.

29 to the mRC System or any product the QIPC Defendants sell or offer for sale in the U.S.,

Quad/Tech, and its counsel also fail to provide evidence that they physically inspected the mRC

System sold in the U.S., which is a requirement under Federal Rule of Civil Procedure 11 before

bringing a patent infringement action in this Court.[5]

The mRC system lacks at least the following Elements of Claim 29:  A1, A2, B1, C, C1

and D1.

(a)     Elements A1 and A2 of Claim 29 require a data array

representative of at least a portion of the actual printed work arranged for storage in memory.

Elements A1 and A2 are not present in the mRC System, because the mRC System does not have

a memory arranged to store pre-press image data in the form of an image-density array of first or

second colors representative of at least a portion of the actual printed work.  See Declaration of

E. Van Holten, attached as Exhibit A, at ¶ 18.  The mRC System's memory is not arranged to

store any information about any image-density arrays of any color representative of any portion

of the actual printed work.  Id. at ¶ 19.

(b)     The mRC System uses as a reference the mathematical orientation

of the registration and reference marks, which are distinct from any portion of the actual printed

work.  See Declaration of E. Van Holten, attached as Exhibit A, at ¶ 20.  The registration and

reference marks, as well as their distances, are distinct from any portion of the actual printed

work.  Id. at ¶¶ 4-10 and 20.  Again, "***portion of the image***" in Elements A1 and A2 cannot be

construed to include registration marks distinct from the actual printed work.  Accordingly, the

operation of the mRC System's memory does not function as required by Elements A1 and A2 of

Claim 29 of the '577 patent.  Id. at ¶ 21.

_____

[5] *See* Section E of this Memorandum.

(c)  Element B1 of the Claim Chart is not present in the mRC System, because the mRC System does not scan any portion of the actual printed image or work for purposes of performing color registration.  *See* van Holten Declaration, Exhibit A at ¶ 22.   Nor does the mRC System produce first and second signals representative of any portion of the actual printed work.  Id. at ¶ 23.

(d)  Element C, and sub-Element C1 are not present in the mRC System, because mRC System does not include a plurality of "image capture boards of image capture circuitry."  *See* van Holten Declaration, Exhibit A at ¶ 24.  Instead, the mRC System includes a single image capture board, because the mRC System uses a single camera and does not require multiple image capture boards as required by Claim 29.  *Id.* at ¶ 25.  Further, Element C1 is not present in the mRC System, because the mRC System does not convert or store any analog signals corresponding to any portions of the actual-printed work.  Id. at ¶ 26.

(e)  Element D1 requires that all Elements A1, A2, B1, C, and C1 are present in a system that arises from Claim 29 to calculate an "offset" between colors.  Because these Elements (A1, A2, B1, C, and C1) are absent from the mRC System, it is not possible for the mRC System to operate in a manner required by Element D1 of Claim 29 to produce an offset between colors.  *See* van Holten Declaration, Exhibit A at ¶ 27.

In this case, there can be no literal infringement, because the mRC System completely lacks elements A1, A2, B1, C, C1, and D1 of Claim 29.  Since Quad/Tech cannot establish that every claim limitation of Claim 29 is within the mRC System, it cannot succeed in this case.  *Gen. Atomics Diazyme Labs. Division, v. Axis-Shield ASA*,[6] No. 2007-1349, 2008 U.S. App.

---

[6] The QIPC Defendants recognize that the *Gen. Atomics* case is specifically not published for precedential value under Appellate Rules 32.1.  The opinion, however, was published after

Continued…

LEXIS 10235 at *10-11 (May 12, 2008, Fed. Cir.) *10-11 (plaintiff failed to prove infringement

for method for analyzing a chemical in human blood, because claim limitation failed to cover

specific chemical used in method accused of infringement.).  Even if one claim limitation of

Claim 29 is not present within the mRC System, Quad/Tech cannot prevail in its Motion.  *See*

*Vehicular Technologies Corp. v. Titan Wheel Int'l, Inc.*, 141 F.3d 1084, 1092-93 (Fed. Cir. 1998)

(in infringement case involving automobile locking differential mechanism, where one key

function did not exist within the accused device, preliminary injunction should not issue).  *See*

*also*, *The Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1539 (Fed. Cir. 1991) (Federal Circuit

found that plaintiff had failed to prove that a single claim limitation was within the accused

product, either literally or by equivalent and reversed judgment of infringement).

 In the case of preliminary injunction motion, where the defendant has raised substantial

questions regarding whether the specification at issue covers the accused product, an injunction

should not issue.  *Novo Nordisk v. Sanofi-Aventis U.S. LLC, et al.,* No. 07-3206, 2008 U.S. Dist.

LEXIS 12342 *44-49 (D.N.J. February 19, 2008), *aff'd*, 290 Fed. Appx. 334 (Fed. Cir. 2008)

(preliminary injunction "not appropriate" where defendant raised substantial question whether

specification of patent read as a whole suggested requirement of direct gearing and non-rotatable

piston rod).  Here, the QIPC Defendants have provided a substantial claim construction that

shows that (a) the mRC System is fundamentally different from the '577 patent and (b) that

many of the claim limitations of Claim 29 do not exist with the mRC System.  By way of

example only, the fact that the mRC System uses registration and reference marks outside of the

actual printed image to control registration and clarity is a fundamental difference and is not

---

….Continued
January 1, 2007, and the principle of law for which it is cited is well-established, and the facts of
the case are analogous.

within the claim limitations of Claim 29.  In fact, Claim 29 describes a system that exclusively

controls registration through an optical scanning of the actual printed image.

For these reasons, Quad/Tech cannot succeed on the merits, and its Motion for

Preliminary Injunction should be denied.

### 2.      The mRC System Does Not Infringe the '577 Patent Under the Doctrine of Equivalents.

Furthermore, there can be no infringement under the doctrine of equivalents for many

reasons.  First, it would be necessary to completely eliminate elements A1, A2, B1, C, C1, and

D1 of Claim 29, to find infringement under the doctrine, which is forbidden. *See, e.g., Warner-*

*Jenkinson Co.,* 520 U.S. 17, 38 n.8 (1999).  Second, the patentee, Sainio, made arguments in the

"Background of the Invention" section of the '577 Patent about the need to eliminate using

registration marks, which would constitute prosecution-history estoppel.  *Haynes Int'l Inc. v.*

*Jessop Steel Co.* 8 F.3d 1573, 1579 (Fed. Cir. 1993).  Further, the use of registration marks is

admitted prior art in the '577 patent, and the elements of Claim 29 cannot be extended to

encompass the use of registration marks. *Pennwalt Corp. v. Durand Wayland, Inc. 833* F.2d 931,

935 n.1 (Fed. Cir. 1987).

A product that does not correspond to the literal terms of patent claim may still infringe

under the doctrine of equivalents. Under this doctrine, a product infringes a claim if it differs

only insubstantially — for example, if it performs substantially the same function in substantially

the same way to obtain the same result as the claimed subject matter. *See Searfoss v. Pioneer*

*Consol. Corp.,* 374 F.3d 1142, 1150 (Fed. Cir. 2004); *see also Graver Tank & Mfg. Co. v Linde*

*Air Prods.*, 339 U.S. 605, 608 (1950).

Nevertheless, in *Warner-Jenkinson Co.,* the Supreme Court restricted the doctrine's

application:

- *All-elements rule.* First, the Court clearly rejected any "invention as a whole" concept, and stated that "[e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole.  520 U.S. at 29.

- *No "vitiation" of claim elements.* Second, the Court held that "the application of the doctrine, even as to an individual element, [is] not allowed such broad play as to effectively eliminate that element in its entirety."  *Id.*  And the Court further held that it was not for a jury to decide whether a patent holder's "theory of equivalence would entirely vitiate a particular element."  *Id.* at 38 n. 8.

Furthermore, the Federal Circuit has long held that the range of equivalents cannot be extended so far as to encompass an accused device in the prior art.  *See e.g., Pennwalt Corp. v. Durand Wayland, Inc.,* 833 F.2d 931, 935 n.1 (Fed. Cir. 1987)(en banc), (*overruled on other grounds*), *Cardinal Chem. Co. v. Morton Int'l, Inc.,* 508 U.S. 83 (1993).

It is also well-recognized that a patentee is not permitted from recapturing claimed subject matter disavowed during prosecution under the doctrine of equivalents, known as prosecution-history estoppel.  *See Haynes Int'l Inc.,*  8 F.3d at 1579.  Statements made in a disclosure document, arguments made during prosecution of a patent, and arguments submitted to obtain a patent, constitute a basis for estoppel.  *Id.* at 1579.

In the case, the '577 patent disavowed a registration method that used registration and reference marks to register color and sought to invent a system that relied on an optical scan of the actual printed image or work to register color.

**E.      Quad Tech Did Not Conduct the Required Pre-Filing Investigation Required Under Federal Rule of Civil Procedure 11.**

Because patent infringement is a question of fact, an attorney's allegation of infringement is subject to the requirement of Rule 11, specifically Rule 11(b)(3), which requires that all allegations and factual contentions have evidentiary support.  In the context of a patent infringement suit, Rule 11 requires a party to construe and then apply the claims of the patent-in-suit to each accused system or process, before filing the claim.

Courts have held that part of this process requires a reasonable effort of analyzing — for example, by inspection, comparative testing, and/or reverse engineering —  and comparing the accused product or process and ascertaining whether the accused product or process satisfies key limitations prior to filing suit.  Failure to do so may result in Rule 11 sanctions for failure to conduct a pre-filing investigation of the alleged-infringing-product or process.  *See Judin v. United States,* 110 F.3d 780, 784-85 (Fed. Cir. 1997) (counsel for a patentee has a duty to visually inspect the actual accused device).

In *Judin*, the Federal Circuit Court concluded that there was no evidence that the plaintiff or his counsel compared the accused device with the patent claims prior to filing the complaint, as required by Rule 11.  *Judin,* 110 F.3d at 784-85.  The court noted that no adequate explanation was offered by either Judin or his counsel regarding why they failed to obtain or attempted to obtain a sample of the accused device from either the source or a vendor, so that its actual design and functioning could be compared with the claims of the patent-in-suit.  *Id.*  For these reasons, the court concluded that Judin failed to meet the minimum obligations imposed by Rule 11 and noted that the Rule 11 violation was not cured by the fact that, after filing the complaint, Judin consulted with an expert and was able to make colorable arguments in response to a motion for summary judgment of non-infringement.  *Id.*

Rule 11 is not about "after-the-fact" investigation.   *See e.g., Bravo Sys., Inc. v. Containment Techs. Corp.,* 96 F.3d 1372, 1375 (Fed. Cir. 1996) (remanding to trial court to conduct Rule 11 inquiry when "there is no evidence that either of Bravo's attorneys compared the accused devices with the patent claims."); *Network Caching Technology, LLC v. Novell, Inc.*, No. 01-2079, 2002 WL 32126128 at * 4 (N.D.Cal. Aug. 13, 2002) (Rule 11 requires that any party make a reasonable inquiry into the applicable facts and law before filing a document, and the standard for a "reasonable inquiry" is an objective reasonableness standard in all circuits).

In *View Engineering, Inc. v. Robotic Vision Sys.*, 208 F.3d 981, 983 (Fed. Cir. 2000), a defendant filed a counter-claim for patent infringement.  The defendant admitted that its basis for asserting the counterclaims was "based solely on [the inventor's]… knowledge of the [ ] patents, [plaintiff's] own advertising, and [plaintiff's] claims to [its own] customers…and [the inventor's] knowledge and understanding of the technology required in the field."  The defendant (counterclaim plaintiff) did not reverse engineer any product because the machines at issue were too expensive to purchase.  The defendant (counterclaim plaintiff) also did not perform any claim construction or infringement analysis before asserting the counterclaims.  In upholding the award of sanctions, the Federal Circuit described what defendant should have done:

> [Defendant] was afforded ample opportunity to construe the 120 claims [plaintiff] was eventually accused of infringing, * * * to appoint an outside expert to review [plaintiff's] machines, to talk to [defendant's] sale corps to learn what it knew of [plaintiff's] machine-in other words, to conduct some form of reasonable inquiry.
>
> *       *       *
>
> Rule 11  [requires a law firm], at a bare minimum, [to] apply the claims of each and every patent that is being brought into the lawsuit to an accused device and conclude that there is a reasonable basis for a finding of infringement of at least one claim of each patent so asserted."

*Id.* at 986.  *See also Refac Int'l v. Hitachi,* 141 F.R.D. 281, 286-87 (C.D. Cal 1991) (because plaintiff did not reverse engineer defendant's products or obtain product schematics before bringing suit, it had not performed a reasonable pre-filing inquiry).

Thus, Rule 11 requires that a plaintiff compare an accused product to its patents on a claim by claim, element by element basis for at least one of each defendant's products.
*See Antonious v. Spalding & Evenflow Companies, Inc.,* 275 F.3d 1066, 1072 (Fed. Cir. 2002): (Rule 11 requires an attorney who files a patent infringement action to compare the accused device with the construed patent claims; attorney may consult with client but may not rely solely on the client's lay opinion that the accused device infringes the patent.  Counsel must make a reasonable effort to determine whether the accused device satisfies each of the claim limitations.)

Here, neither Quad/Tech nor its counsel did any of the required analysis.  There is no evidence that Quad/Tech or its counsel purchased the mRC System sold or offered for sale in the United States, reversed engineering it, inspected it, performed a claim construction analysis or performed an infringement analysis.[7]  As a result, Quad/Tech and its attorneys have brought a lawsuit without performing the minimum requirements under Rule 11.  For that reason alone, Quad/Tech's Motion should be denied.

---

[7] *See S. Bravo Systems, Inc.*, 96 F.3d at 1375 (reversing district court's denial of sanctions and remanding for the district court for further consideration where the attorneys had relied solely on lay Plaintiff and lay Plaintiff had relied on unauthenticated photographs of the allegedly infringing device and had reviewed literature pertaining to the device, but had never seen the device depicted in the photographs, never seen the sensor device at issue before, and had no personal knowledge about how the sensor worked).

**F.    The '577 patent is Unenforceable Because Quad/Tech Obtained It Through Inequitable Conduct**

The Court should deny Quad/Tech's Motion because the '577 patent is unenforceable.

Quad/Tech obtained the '577 patent through inequitable conduct before the United States Patent

and Trademark Office ("USPTO").  See paragraphs 118–131 of QIPC's Answer and

Counterclaims, which are incorporated herein by reference.

Because the QIPC Defendants raise a substantial question of unenforceability that makes

the '577 patent vulnerable to declaration that it is unenforceable, the Court should deny

Quad/Tech's Motion so that this substantial question may be explored by the parties and

considered by the Court after a normal period of discovery.

In *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1359 (Fed. Cir. 2001)

the Federal Circuit stated:

> In resisting a preliminary injunction … one need not make out a
> case of actual invalidity. Vulnerability is the issue at the
> preliminary injunction stage, while validity is the issue at trial. The
> showing of a substantial question as to invalidity thus requires less
> proof than the clear and convincing showing necessary to establish
> invalidity itself.

In *Titan Tire Corp. v. Case New Holland, Inc.,* 566 F.3d 1372, 1379-80 (Fed. Cir. 2009),

the Federal Circuit held that:

> If the trial court concludes there is a 'substantial question'
> concerning the validity of a patent, meaning that the alleged
> infringer has presented an invalidity defense that the patentee has
> not shown lacks substantial merit, it necessarily follows that the
> patentee has not succeeded in showing it is likely to succeed at trial
> on the merits of the validity issue." (citations omitted).
>
> ***
> We reiterate that the 'clear and convincing' standard regarding the
> challenger's evidence applies only at trial on the merits, <u>not at the
> preliminary injunction stage</u>. The fact that, at trial on the merits,
> the proof of invalidity will require clear and convincing evidence is

> a consideration for the judge to take into account in assessing the
> challenger's case at the preliminary injunction stage; it is not an
> evidentiary burden to be met preliminarily by the challenger.

*Id.* (Emphasis added)

Inequitable conduct is an equitable doctrine. Because the QIPC Defendants now raise a substantial question as to the enforceability of the '577 patent based in the patent holder's inequitable conduct, a preliminary injunction should be denied, and this case should be placed on a standard track.

### G.     The German Court's Decision is Not Relevant to This Case or Binding on this Court.

The German case involved different facts, a different product of the QIPC Defendants, a different court, and German law. For those reasons, the German decision has no application in this court for this dispute, it is not controlling in this case, and the factual determinations made by the German Court are not entitled to any deference or preclusive effect.

In is well-accepted that "[c]ourts in the United States do not defer to decisions in foreign courts or patent offices on questions of validity." *Oki Am. v. Advanced Micro Devices, Inc.*, No. C. 04-03171 CRB, 2006 WL 3290577, at *8 n.2 (N.D. Cal. Nov. 13, 2006) (citation omitted) (holding that "the action taken by the European Patent Office rejecting counterpart application over the same reference is neither controlling nor persuasive."); *see also, e.g.*, *Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903, 907-908 (Fed. Cir. 1986) ("As a final effort to prove obviousness of the '501 invention, Daig urges this court to adopt the conclusion of a German tribunal holding the '501 German counterpart patent obvious. This argument is specious. The patent laws of the Untied States are the laws governing a determination of obvious/nonobviousness of a United States patent in federal court."); *Skil Corp. v. Lucerne Prod., Inc.*, 684 F.2d 346, 351 n.3 (6th Cir. 1982) ("Patent proceedings in other countries are not controlling, in part because the

standards of patentability vary widely from country to country."); *Allen v. Howmedia Leibinger, Inc.*, 197 F. Supp. 2d 101, 110 (D. Del. 2002), *aff'd*, 54 Fed. Appx. 697 (Fed. Cir, 2003) (noting that the Federal Circuit has "specifically rejected as 'specious' the argument that a United States court should adopt the conclusion of a foreign tribunal" and holding that revocation of German patent did not require defendants to concede their constitutionally protected property right in their U.S. patent);

In *Cuno Inc. v. Pall Corp.*, 729 F. Supp. 234, 237 (E.D.N.Y. 1989), the court considered whether factual findings made by an English court in a prior patent adjudication between the parties were subject to collateral estoppel.  The court noted that the application of collateral estoppel to patent cases was appropriate but that "the Federal Circuit has shown a general antipathy to applying collateral estoppel as a basis for judgment in circumstances arguably similar to those presented in this case." *Id*. at 238.  The court concluded that

> [w]here the prior adjudication was by a foreign nation's court applying its patent law to its patents, the barriers to reliance on the foreign judgment for collateral estoppel purposes become almost insurmountable.  Differences in the law of the two nations and in the detailed language of the patent are emphasized to avoid issue preclusion in a patent case pending in this country even where the invention, the technological and economic competition between the parties, and consequences for the judgments are for all practical purposes the same.

*Id*. at 238-39.  The court determined that collateral estoppel would not apply.  *Id*. at 239.

For these reasons, the German decision has no application in this court for this dispute, is not controlling in this case, and is not entitled to any deference or preclusive effect.

IV.   **CONCLUSION**

For all of the foregoing reasons, the QIPC Defendants respectfully request that this Court

deny plaintiff Quad/Tech's Motion for Preliminary injunction.

Respectfully submitted,

Dated:  July 31, 2009                                    /s/ David D. Langfitt
                                              Stephen A. Madva, (Pa. I.D. ##17596)
                                              David D. Langfitt (Pa. I.D. #66588)
                                              Robert R. Axenfeld (Pa. I.D. #63343)
                                              Montgomery, McCracken,
                                                 Walker & Rhoads, LLP
                                              123 S. Broad Street
                                              Philadelphia, PA  19109
                                              (215) 772-1500

                                              **Counsel for Defendants Q.I. Press Controls B.V.,
                                              and Q.I. Press Controls North America Ltd.,
                                              Incorporated**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I caused a true and correct copy of the foregoing Memorandum of Defendants Q.I. Press Controls B.V. and Q.I. Press Controls North America Ltd., Inc. In Opposition to Plaintiff's Motion for Preliminary Injunction to be served on the following counsel of record by email:

Frederick A. Tecce, Esq.
McShea/Tecce, P.C.
The Bell Atlantic Tower – 28th Floor
1717 Arch Street
Philadelphia, PA  19103

**Counsel for Plaintiff Quad/Tech, Incorporated**

Michael N. Onufrak, Esquire
Justin E. Proper, Esquire
White and Williams
1800 One Liberty Place
Philadelphia, PA 19103-7395

**Counsel for Defendant Print2Finish, LLC**

July 31, 2009                    _/s/ David D. Langfitt_____
                                            David D. Langfitt